Will the clerk please call the first case of the afternoon? 1-25-0231 Wilfredo Cruz, appellant by Rocco Motto v. Illinois Workers' Compensation Comm'n et al., RZA Cadillac, Appali by Guy Morris. Mr. Motto, you may proceed. Thank you. May it please the courts, my name is Rocco Motto, here on behalf of the appellant Wilfredo Cruz. I'm here today to ask this court to reverse the decision of the commission and find it is against the manifest weight of the evidence, specifically as the causation regarding the appellant's injury to his head and cervical and lumbar spine. Again, the sole issue today is one of causation. The commission found that the appellant's injury to his head was causally related to the November 2020 work injury. However, the commission also found that his injury resolved on October 5, 2021. Additionally, the commission found that the appellant's cervical and lumbar spine injuries to be causally related to the November 2020 work injury. However, the commission found the appellant's cervical and lumbar injuries resolved on September 29, 2021. The appellant asked this court to find that the commission's decision was against the manifest weight of the evidence and to reverse its decision and remand for further proceedings. Based on the medical records and the record as a whole, including Commissioner Simonovic's dissenting opinion, the commission's decision was against the manifest weight of the evidence as an opposite conclusion is clearly apparent. This court has long held that a chain of events which demonstrates a previous condition of good health, an accident, and a subsequent injury resulting in disability may be sufficient evidence to provide a causal nexus between the accident and the employee's injury. Before this work injury, appellant was in good health and he had no prior complaints to his head or his neck. While he did receive an SI joint injection before the work accident, he was able to perform his full job without restriction. Given that the appellant sustained injuries to multiple parts of his body, I'd like to first address his cervical and lumbar spine. In finding that appellant's spinal injuries resolved on September 29, 2021, the commission relied on the lack of objective evidence and Dr. Singh's report. When looking at Dr. Singh's report, it's noted that he reviewed the medical records informing his opinions and conclusions, and those medical records are as follows. Two days of service from Dr. Kenneth Moore, who is the appellant's neurologist, who treated him for his post-concussive symptoms. And the other record he reviewed was Dr. Kramer's IMU report, which was the first time Dr. Kramer evaluated the appellant. Dr. Singh did not review a medical record from any of appellant's providers who treated him for his neck and back condition. This is nearly a year worth of medical record and includes medical treatment from Dr. Bokhari, Dr. Hassan, Dr. Saeed, Dr. Khan, Dr. See, Dr. Callen, and Dr. Robinson. Appellant testified that Dr. Singh's examination took less than 15 minutes and consisted of Dr. Singh rubbing a brush on his right wrist. But the commission defined Dr. Singh's opinions persuasive is against the manifest weight of evidence. When looking at the medical records before and after Dr. Singh's IME, the opposite conclusion is apparent. For example, on September 29th, 2021, which was the same day as Dr. Singh's IME, the appellant was examined by Dr. Bokhari, where he continued to report chronic neck pain, and the examination revealed a left cervical paraspinal muscle spasm. This is on page 244 of the record. Approximately a week later, Dr. Robinson's treating orthopedist revealed a positive Sperling's maneuver, limited cervical range of motion, positive straight leg raise, and limited lumbar range of motion. This is page 309 of the record. Dr. Robinson also thoroughly rebutted Dr. Singh's report by noting the employee's lack of symptoms and ability to work without restriction before the work accident. She stated, the mechanism of injury of an 80-pound tire falling on his head, hitting his head first on the tire and then on the concrete, is consistent with causing his current complaints. It was her opinion within a reasonable degree of medical certainty the trauma caused an aggravation of his pre-existing underlying degenerative conditions, which changed the course of his neck and neck pain. On October 2021, Dr. Robinson diagnosed him with cervical and lumbar radiculoscopy. This was the first time he received this diagnosis. Then on March 28, 2022, an EMG confirmed he suffered from C7 radiculoscopy. Consistent with Edgecombe, the only doctors to truly treat and examine the appellant for his lumbar and cervical injuries were his own treaters. Furthermore, not a single one of the appellant's doctors released him to return to work in any capacity. The appellant court found this to be compelling. Lastly, on par with Schroeder, the commission and Dr. Singh did not take into account that the appellant was unable to return to work following this work injury. The decision is silent. Again, appellant worked as a mechanic for 40 years. He sustained a significant head injury and was not released to return to work by any of his treating doctors. Instead, he applied for social security disability and was awarded. I would now like to address the injury to appellant's head. Do we have any questions? In finding that appellant's post-concussion syndrome resolved on October 5, 2021, the commission relied heavily on the six diagnostic studies of the head and brain that were taken between November 2020 and September of 2021. However, when Dr. Kramer first examined the appellant on May 20, 2021, Dr. Kramer reviewed diagnostic tests such as a CT scan, an EEG, and an MRI of the brain. Even though Dr. Kramer noted that the objective studies were normal, he still diagnosed the appellant with post-concussion syndrome with persistent left peripheral vestibular apathy as well as occipital neuralgia, right greater than left. He directly related his symptoms to the November 2020 work injury and recommended additional treatment. Again, Dr. Kramer provided his diagnosis and additional medical treatment when acknowledging that the objective findings were normal. If Dr. Kramer found the lack of objective evidence significant, he would have noted that in his report. He didn't. Yet the reason the commission did not find his head injury causally related was foundationally based on these objective findings in which defendant's own doctor did not find significant. It was only until Dr. Kramer that, excuse me, would you repeat that? What I said was yet the reason the commission did not find his head injury causally related was foundationally based on these objective findings. Well, is there a credibility issue here of the claimant at all? The commission did note a credibility issue and that was partly based on he didn't provide the correct data as to when he received the SI joint injection before the work injury. He noted that he received an injection. He stated it was six months as opposed to two months. As a reminder, this individual sustained a significant brain injury. Both doctors indicated it was a traumatic brain injury. And the medical records don't lie. Those records went into evidence. The appellant was not trying to hide anything. So the credibility issue doesn't go to anything else in terms of self-reporting symptoms and conditions. Can you expand on that, Justice? No. How far does the credibility finding go? Does it go to everything he talks about, talking about his conditions generally in the face of apparently objective medical evidence? Well, you know, there are portions of his testimony where, and you'll see this in the IME report when I talk about Dr. Kramer's second IME report. He does come to the second IME report with a gait. And yeah, he did not have a gait with any of his treating doctors. I can't address as to why that happened. Again, he sustained a traumatic brain injury along with a cervical and lumbar injury. Okay. Thank you.  Well, wasn't there also some issue with credibility that the commission found in regard to his self-reporting of symptoms that weren't consistent with some of the treating physicians' opinions? Yes, you're correct, Justice. It was only until Dr. Kramer's re-evaluated the appellant on October 5th, 2021, that he noted the appellant's complaints were not supported by the objective findings. Dr. Kramer placed the appellant at MMI despite the fact that he continued to show persistent symptoms and diagnosed him with occipital neuralgia. Following Dr. Kramer's IME, appellant continued to treat with his treating doctors, where he continued to complain and continued to have headaches and dizziness. Similar to Schroeder, the commission failed to take into account how the appellant's ability to work significantly changed and deteriorated after his injury. Before the injury, the appellant worked as a mechanic for 40 years. He didn't have any restrictions. Following the accident, not a single one of his treating doctors returned him back to work. He was awarded social security disability. In conclusion, the chain of events is clear. Appellant was a functioning mechanic before his work injury, immediately found the injury, never returned to work in any capacity, and is yet to be released by any of his doctors. To find that his current condition to his head and lumbar and cervical spine is not related to his work injury is against the manifest weight of the evidence, as the opposite conclusion is clearly apparent from the medical records and the record as a whole. I would ask this court to please reverse the commission's decision and remand for further proceedings. Thank you. Any questions from the court? No. Counsel, you'll have time in reply. Thank you, your honor. Attorney Maris, you may respond. Thank you, your honor. May it please the court, Guy Maris, on behalf of the defendant, Risa Cadillac. The evidence in this case is considerable, and we argue that it overwhelmingly favors the finding and support of the decision that the plaintiff's condition of ill-being resolved, and that there is nothing ongoing that is causally related to the accident at issue. So with our time allotted, I will focus on the objective medical evidence, the comments of the plaintiff's treating physicians, and issues of credibility, which the commission found relevant in finding that the plaintiff's condition has resolved, and therefore, his current complaints of ill-being are not related to the accident at issue. I will also spend some time responding to some of the arguments made by counsel this afternoon. Now, the diagnostic studies are numerous. I will hesitate to go into an analysis and a summary of each of those diagnostic studies, but I do want to point out generally what they found. It's July 24, 2020, the petitioner had an MRI of the lumbar spine, which had positive findings. It's also noteworthy that no post-lumbar MRI was conducted by anybody, nor was it even suggested. The first MRI study the day after the incident of the brain was, I'm sorry, it was a CT scan. It showed nothing, no intracranial hemorrhage, and the study was determined to be normal. And then, a couple of weeks later, on December 2nd, a second CT scan showed, again, no evidence of intracranial hemorrhage. A week later, on December 10, 2020, an EEG study was conducted, and that too was normal. Four days later, an MRI demonstrated a tiny six-millimeter focus of hyper-intense signal, and it was noted by the radiologist that it was possibly related to a pre-existing ischemic infarct. So, other than that possibly pre-existing condition, it was otherwise normal. And then, in February of 2021, the cervical spine essentially showed no bulges or herniations. No acute findings were noted, no acute findings on the MRI of the cervical spine. And then, in March of 2022, an EMG study also showed delay in the forearm and possible chronic nerve root involvement. A third MRI scan was done in September of 2021, sorry, a CT scan of the brain, and that was normal. Another CT scan in September of 2021, nothing to indicate that it is a result of any trauma. Overall, six diagnostic studies of the head and brain, three to the spine, and the commission noted that these findings were relevant. The commission found that none of the diagnostic studies were noteworthy, and we note that counsel has mentioned that these findings were normal but still noteworthy. The point that we would ask that court take judicial notice that the point of a diagnostic study is to determine an inside view of what's going on with a person's condition, in this case, the brain and the spine, the cervical spine, and nothing was noted. Now, the gait pattern is also a point that I would like to address. And I would like to address this because Dr. Kramer found it to be noteworthy, and arbitrator Hipsch, in ruling on this case, he tried the case and he found credibility at issue, commented that Dr. Kramer's report. So, the petitioner gait pattern was first commented on in February, I'm sorry, January 25th of 2021 by Dr. Bokhari, and he found that it was normal. Two months later, Dr. Bokhari stated the same thing, normal gait pattern. May 27th is when petitioner went and saw Dr. Kramer, our evaluating physician, and at that point, Dr. Kramer stated the gait was normal. Again, two months later, Dr. Khan, normal gait pattern. Again in July, Dr. Moore, another physician, normal gait pattern. Then in September of 01, Dr. Moore, normal gait pattern. That was back to Dr. Kramer in October of 2021, when he noted the abnormal gait pattern, not only an abnormal gait pattern, but exaggerated pain symptoms. This is when Dr. Kramer questioned the petitioner's credibility, and that's when arbitrator Hipsch made note of that in his decision, which the commission affirmed. And we find that to be a noteworthy finding by Dr. Kramer to observe the gait pattern on his own, to be different, and we point out to the court that the gait pattern was normal by all these treating physicians, and then only when he went and saw an evaluating physician were there abnormal findings. And then even after the IME with Dr. Kramer, he went and saw Dr. Shobhatia in March of 2022, again with a normal gait pattern. Now, I also want to point out some of the other issues which I think impeach the petitioner's credibility, and this is what arbitrator Hipsch and the commission looked at. Before the incident, the petitioner, or plaintiff, sorry, was seen by Dr. Danaher and mentioned having a visual aura and blurring across his field of vision for at least 10 years. And I know counsel isn't addressing this issue today, and I understand that, but it's noteworthy still. He reported to Dr. Danaher an issue of visual aura for 10 years, and then he goes and sees Dr. Deutsch on December 19 of 21, and Dr. Deutsch says, you need a pair of glasses to fix this. So he noted age-related cataracts. This is not related. There's no causal connection between the petitioner's visual issues and the accident at issue. Yet those are points that were argued below, and they have to be argued today by counsel, but they were argued below. And it's interesting that the commission commented, if the glasses might improve the petitioner's vision, why not pursue the recommendation? That's what the arbitrator asked in his decision. It's a noteworthy point. Now, with respect to the treaters, it's interesting that Dr. Callan, on July 28, 2022, and counsel mentioned Dr. Callan above in his argument, that his pain began after no specific inciting event. In other words, no causal connection. I'd also like to draw the court's attention to the observations and comments of Dr. Moore. In July 28 of 2022, Dr. Moore characterized this as an unusual case. He characterized it as very unusual. But it's also noteworthy. He said this, the plaintiff does not have any anatomic symptoms, and I quote, does not meet the criteria for any recognized primary headache disorder. That's where the quote ends. You saw Dr. Moore again on August 17, 2021, and stated that the condition is, in large capital letters by Dr. Moore, unlikely to be related to work injury. So, you know, there are so many points at issue here. I'll also address the cases that counsel raised in his argument, in his brief. There are distinctions. In those cases, there was objective evidence of conditions that needed to be addressed and treated. Surgical recommendations were made. In those cases, there were no comments about the credibility of those plaintiffs. Here, there are questions about his credibility, and those are very distinct from this particular case. I also would like to point out the fact that counsel mentioned in his argument earlier, that this is a significant brain injury. Well, that's not what Dr. Moore said. He characterized as a mild brain injury. So, mild and significant are at the opposite ends of the spectrum of characterization, so I think counsel is incorrect in that characterization, characterization according to the record. So, with those comments, I thank the court for your attention to this case and the amount of evidence. With respect, the defendant respectfully requests that this honorable court affirm the decision of the commission and the circuit court. Thank you. Any questions from the court? Okay. Thank you. Counsel Motto, you may reply. Thank you. Just a couple of points. So, on October of 2021, Dr. Robinson did recommend a MRI of a lumbar spine. However, at that time, the case had already been denied by work comp as a result of Dr. Singh's IME appointment. The other point I want to make is Schroeder. In Schroeder, there was no diagnostic proof, any objective images related to her back. She had a significant history of back surgeries. She had objective images done before and after her work injury. There was no change on x-ray, and there was no change on MRI. The only time a change was noted was after her surgery, during the operative report. That is when a change was noted. And again, the court in Schroeder was very clear. They did not look at how this injury impacted her ability to return to work. Just like this case, this case is identical to Schroeder. The objective evidence is lacking. There's no question about it. But his ability to return to work as a mechanic completely deteriorated after the injury. Thank you. In that case, did the claimant have any pre-existing conditions with regard to going to see doctors two months ahead of, before the accident, or complaining of vision issues for, you know, any amount of time? Not specifically those types of problems, but... Yes. Yes. Yes. Yes, your honor. So, Schroeder was treating with Dr. Yazbek. I believe it was months before her injury, and Dr. Yazbek recommended that fusion. Instead of her undergoing the fusion, she returned back to work, sustained a back injury, and Dr. Yazbek then recommended that exact fusion, and she had the surgery after the work injury. Any other questions from the court? Okay. Well, thank you, counsel, both for your arguments in this matter this afternoon. It will be taken under advisement, and a written disposition shall issue.